# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| ALI A. JAMOUS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No.:  5:14-cv-01517-JEO** |
| | ) | |
| SAINT-GOBAIN CORPORATION,[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>[2]

Plaintiff Ali A. Jamous ("Jamous" or "Plaintiff") initiated this action against his former employer, Defendant Saint-Gobain Ceramics & Plastics, Inc. ("Saint-Gobain" or "Defendant"), for alleged retaliation, discrimination, and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981") .  (Doc. 1).  The case is now before the court on the parties' cross-motions for summary judgment.  (Docs. 41 & 42).  The motions are fully briefed and ripe for review.  (Docs. 41, 42, 43, 44, 45, 46 & 48).  For the reasons set forth herein, the court finds Jamous's motion for summary judgment is due to be denied, Saint-Gobain's motion for summary judgment is due to be granted, and this action is due to be dismissed with prejudice.

---

[1] The defendant is correctly identified as Saint-Gobain Ceramics & Plastics, Inc. (*See* Doc. 42 at 1).

[2] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment.  (Doc. 17).

# I.  <u>STANDARD OF REVIEW</u>

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986).  The party moving for summary judgment always bears the initial burden of informing the court of basis of his motion and proving the absence of a genuine issue of material fact.  *Id.* at 323.  The underlying substantive law determines which facts are material and which are irrelevant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2512 (1986).

If the moving party does not meet his initial burden, the Court must deny the motion for summary judgment.  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993) (citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991)).  Once the moving party has met his burden, then the non-moving party must "go beyond the pleadings" and point to specific facts in the record to show there is a genuine issue for trial.  *Celotex*, 477 U.S. at 324 (citation omitted).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (per curium) (quoting *Anderson*, 477 U.S. at 249).  The court must "examine the evidence in the light most favorable to the non-moving party," drawing

all inferences in favor of such party. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir.

2000). Any factual disputes will be resolved in the non-moving party's favor when sufficient

competent evidence supports that party's version of the disputed facts. *See Pace v. Capobianco*,

283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-

moving party's favor when that party's version of the events is supported by insufficient

evidence.). However, "mere conclusions and unsupported factual allegations are legally

insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th

Cir. 2005) (per curiam) (citation omitted). Moreover, "[a] mere 'scintilla' of evidence

supporting the opposing party's position will not suffice; there must be enough of a showing that

the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.

1990) (citing *Anderson*, 477 U.S. at 252). Finally, "[t]he court need consider only the cited

materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II. RELEVANT FACTUAL BACKGROUND

### A. Jamous's background and employment at Saint-Gobain

Jamous is originally from Nablus, a city in the West Bank, which was in Jordan at the

time Jamous was born there, and he is a practicing Muslim. (Doc. 1 at 3; Doc. 41-2 at 4).[3]

Jamous immigrated to the United States to attend graduate school, and he obtained a master's

degree in physics from the University of Alabama at Huntsville in 1986. (Doc. 41-2 at 5-6).

Saint-Gobain hired Jamous in 1995 as a utility worker, and he worked in its Huntsville

facility until July 31, 2013, when Saint-Gobain terminated his employment. (*Id.* at 8; Doc. 44-1

at 2). In 1996, Jamous was promoted to a floor man position at the plant. (Doc. 41-2 at 8).

Saint-Gobain then promoted Jamous to a furnace operator position in 1999. (*Id.* at 8-9). The

---

[3] All citations to the record refer to document and page numbers as assigned by the
Court's electronic filing system.

operator position was the highest hourly, nonsupervisory position at Saint-Gobain's Huntsville plant. (*Id.*). Jamous did not want to be a supervisor and did not apply to become a supervisor at Saint-Gobain. (*Id.* at 9). Jamous applied for a position in a lab at Saint-Gobain during the 1990s, but did not receive the position. (*Id.*). Jamous also requested transfers to various departments within Saint-Gobain's Huntsville facility in 2011 and 2012, and he received the requested transfers. (*Id.* at 9-10).

During his time working at Saint-Gobain, Jamous received several written disciplinary notices. (*See* Doc. 44-3). First, on April 29, 2005, Jamous received a permanent written warning for an incident in which he hit another employee while operating a forklift. (*Id.* at 2). Jamous received a second written warning on August 6, 2012, for failing to follow a mix card, or written instructions for feed cycles, while operating a furnace. (*Id.* at 3). Finally, on February 5, 2013, Jamous received another written warning for not following a mix card. (*Id.* at 4). Jamous disputes that he signed the written notices and that the notices were proper. (Doc. 41-2 at 12, 14 & 16-18; Doc. 44-4 at 8-9). Jamous's February 2013 warning did not result in a suspension or further discipline, or affect his work hours, benefits, or pay. (Doc. 44-6 at 6). Indeed, in April 2013, Jamous received the same 1.98 percent merit pay raise in 2013 that all other hourly Saint-Gobain employees in Huntsville received. (*Id.*).

B. The skid steer incident and Jamous's medical leave

While at work on May 2, 2013, Jamous used a skid steer[4] to move hot material into a hopper where the material would be crushed. (*See* Doc. 41-2 at 33; Doc. 44-7 at 2; Doc. 44-8 at 2). Jamous operated the skid steer erratically, causing the hot material to fall on the top of the skid steer and on the floor. (Doc. 41-2 at 33-24; Doc. 44-7 at 2; Doc. 44-8 at 2). Jamous's

---

[4] A skid steer is type of front loader that is also referred to as a Bobcat in the record.

4

supervisor, Mark Heard, reported that he stopped Jamous from operating the skid steer.  (Doc. 44-7 at 2).  Heard also reported that Jamous told him the FBI was controlling the skid steer and that "[Jamous] really believes that the FBI is out to get him."  (*Id.*; Doc. 44-8 at 2).  Jamous disputes Heard's characterization of the incident and asserts he alerted Heard that something wrong with the skid steer and told him the FBI must have "done some theology to it."  (Doc. 41-2 at 34).  During his deposition, Jamous testified he was just "carrying on" or joking when he made the comment about the FBI to Heard, but he also testified Heard might have thought he was serious.  (*Id.* at 34-35 & 41).  After Jamous erratically operated the skid steer, Heard got in the skid steer and was able to operate it without any issues.  (Doc. 44-7 at 2).

One week after the incident involving the skid steer, Saint-Gobain held a meeting with Jamous, Rob McFadden (the plant manager for Saint-Gobain's Huntsville facility), Nancy Hale (the human resources manager for Saint-Gobain's Huntsville facility), and Lisa Grossi (Saint-Gobain's human resources director).  (Doc. 41-2 at 43; Doc. 44-6 at 2 & 9; Doc. 44-9 at 2).  The purpose of the meeting, according to Saint-Gobain, was to address safety concerns relating to Jamous's operation of the skid steer on May 2, 2013.  (Doc. 44-6 at 9).  During the meeting Saint-Gobain questioned Jamous about the incident involving the skid steer and Jamous's statement to Heard.  (*See* Doc. 41-2 at 43-44; Doc. 44-6 at 9).  Jamous testified he told everyone at the meeting that he told Heard the FBI might have done theology to the skid steer, while Hale and McFadden both assert Jamous told them the FBI sabotaged the skid steer and controlled it.  (Doc. 41-2 at 44; Doc. 44-6 at 9; Doc. 44-9 at 2).  At the conclusion of the meeting, McFadden informed Jamous he must be evaluated for his fitness for work in order to insure the safety of all employees at the Huntsville facility.  (Doc. 41-2 at 44; Doc. 44-6 at 9; Doc. 44-9 at 3).  Jamous

was also told "he would not return to work until he was cleared by the doctor to return."  (Doc. 44-6 at 9).

To be evaluated for his fitness to work, Jamous was sent to OHG of Madison, where he saw Dr. James Gauthier.  (Doc. 41-2 at 44 & 46; Doc. 44-18 at 2).  Gauthier recommended Jamous "be kept off work until he was medically cleared by his personal physician with consultation with [] Gauthier."  (Doc. 44-18 at 2).  Jamous then went to see Dr. Stevens at South Parkway Medical Center for lab work and a medical evaluation, and Jamous testified Stevens told him there was nothing wrong with him.  (*See* Doc. 41-2 at 44 & 68; Doc. 44-18 at 2).  Following his appointment with Stevens, Jamous was told by OHG that he needs to see a psychiatrist, and Stevens gave him the name of a psychiatrist to contract.  (*See* Doc. 41-2 at 44; Doc. 44-13 at 2).  Jamous called that psychiatrist, but the psychiatrist would not see him.  (Doc. 41-2 at 44).  Accordingly, he contacted Hale, who helped him set up an appointment with a psychiatrist at Alabama Psychiatric Services ("APS") who would take his medical insurance.  (*Id.*; Doc. 41-3 at 45-47; Doc. 44-6 at 2-3).

Jamous saw Dr. Sofia Aeschlimann at APS on June 13, 2013.  (Doc. 41-1 at 17; Doc. 41-2 at 47).  Aeschlimann diagnosed Jamous with "psychosis, not otherwise specified," and noted Jamous "does not see the need to take medication."  (Doc. 41-1 at 18).  Aeschlimann also gave Jamous a letter dated June 14, 2013 recommending Jamous be off work from June 14, 2013 to July 14, 2013, and Jamous gave the letter to Saint-Gobain.  (Doc. 44-6 at 3; Doc. 44-15 at 2).

Jamous had a second appointment with Aeschlimann on June 25, 2013.  (Doc. 41-1 at 19).  Aeschlimann's notes from that meeting indicate she "[s]poke to [Jamous] about [the] need to receive treatment for delusions of persecution regarding the FBI" and that Jamous was "aware of implication of refusing treatment—may lose job."  (*Id.*).  According to Jamous, Aeschlimann

6

threatened that he would "suffer financial problems" if he did not take medication for psychosis. (Doc. 41-2 at 66).  Jamous did not return to any further visits with Aeschlimann or any other psychiatrist at APS.  (*See* Doc. 41-1 at 20).

    C.   Jamous's termination from Saint-Gobain

    After Jamous's medical leave period ended on July 14, 2013, Hale called Jamous, but could not reach him.  (Doc. 44-6 at 3).  She then sent Jamous a letter dated July 19, 2013 stating in pertinent part as follows:

> We have been attempting to contact you for the last couple of days concerning your absence.  According to the letter from [APS], you were evaluated and to be off work from 06/14/13 through 7/14/2013.  [ . . . ]  In order for you to return to work, you will need to get a release from [APS] and then we will set you up with Occupation Health Group for a Fit [for] Duty Return to Work release.  If we do not hear from you by July 31, 2013, we will assume you have left on your own accord without notice to us and terminate your employment at that time.  If you have any questions, please contact me by telephone only.  You are not permitted on the Company premises at this time.

(Doc. 41-1 at 22).  Jamous asserts he attempted to secure a release from APS to return to work, but APS refused to give him the form and told him to leave.  (Doc. 41-2 at 30).  Jamous admits he did not call Saint-Gobain after receiving the July 19, 2013 letter, but testified his attorney called Saint-Gobain and left a voicemail on his behalf in response to the letter.  (*Id.* at 50).  Hale contends she did not receive any call or voicemail from either Jamous or his attorney in response to her letter.  (Doc. 44-6 at 4).

    Saint-Gobain terminated Jamous's employment because of "job abandonment/no-call – no-show."  (Doc. 44-1 at 2; Doc. 44-6 at 4).  According to Saint-Gobain's attendance policy, "[e]mployees absent three [] consecutive days without notice will be considered to have voluntarily terminated from the [c]ompany;" therefore, Saint-Gobain's progressive discipline process did not apply to Jamous's termination.  (Doc. 44-6 at 4 & 19).  Hale sent Jamous a letter regarding his termination, which states in pertinent part as follows:

> A registered letter was sent to you July 19th 2013 [] concerning your employment with Saint-Gobain, which you received on July 22nd, 2013. You were required to contact us by July 31st, 2013. As of July 31st, 2013, we still had not heard from you; therefore, your employment with Saint-Gobain is terminated effective on that date. You are considered to have left on your own accord without notice.

(Doc. 41-1 at 23).

D. Jamous's allegations and EEOC charge

On August 1, 2013, the day after Saint-Gobain terminated his employment, Jamous filed an EEOC charge alleging Saint-Gobain discriminated and retaliated against him and subjected him to a hostile work environment based on his race, religion, and national origin. (Doc. 44-5 at 2). Jamous asserts he was treated differently than other employees while he was employed at Saint-Gobain. (*See* Doc. 1 at 3; Doc. 41 at 2). Specifically, Jamous points to the following conduct by employees and supervisors at Saint-Gobain to support his claims against Saint-Gobain:

(1) he was required to operate broken machinery;

(2) he was required to enter buildings in which the air was filled with so many dust particles that it was hard to see and breathe, while others were not required to do so;[5]

(3) he was disciplined for not properly using a mix card when he had no training on the mix cards;

(4) he was disciplined for an accident in 2004 in which he hit another employee with a forklift, while another employee who had a similar accident was not disciplined;

(5) a supervisor attempted to discipline him when a breaker "kicked off" while Jamous was operating a furnace;

(6) a supervisor threatened to post Jamous's social security number in 2008 to make it easier for someone to steal Jamous's identity;

---

[5] Jamous filed a complaint with OSHA regarding this incident, but Saint-Gobain did not receive notice of his complaint. (Doc. 41-1 at 3; Doc. 41-2 at 57-58 & 68-69; Doc. 44-6 at 5).

(7) Saint-Gobain denied Jamous an opportunity to accrue overtime in the same way that other employees did; and

(8) Jamous's supervisor, Donnie Lamb, told him to stop reading the Quran on one occasion, while other employees were allowed to read the Bible and magazines, including Playboy in the breakroom at work.

(Doc. 41-2 at 53-54, 64-65, 68-69; Doc. 44-5 at 3-6; *See also* Doc. 41 at 2-3, 15-16; Doc. 45 at 2-3, 14-15).  Jamous did not make any internal complaints to Saint-Gobain regarding the alleged discrimination and harassment.  (Doc. 41-2 at 24; Doc. 44-4 at 4).

The EEOC closed its file on Jamous's charge and issued a right to sue letter on June 24, 2014.  (Doc. 1 at 16).  This action followed.

## III.  <u>ANALYSIS</u>

Jamous's Complaint asserts four counts against Saint-Gobain, three of which contain multiple claims.[6]  (*See* Doc. 1 at ¶¶ 19-46).  Jamous's claims are based on his allegations Saint-Gobain retaliated against him, discriminated against him, and subjected him to a hostile work environment in violation of Section 1981 and Title VII.[7]  In the interest of clarity and brevity, the court will address Jamous's claims based on the legal theory underpinning the claims, rather than in the order they are presented in Jamous's Complaint or the parties' motions for summary

---

[6] Count I of Jamous's Complaint is entitled "Section 1981 Discrimination and Retaliation Claim" and contains discrimination and retaliation claims under Section 1981.  (Doc. 1 at 4).  Count II is entitled "Retaliation" and is a restatement of Jamous's § 1981 retaliation claim.  (*Id.* at 5).  Count III is entitled "Religious Discrimination, Hostile Environment, and Retaliation" and contains retaliation, discrimination, and hostile work environment claims under Title VII.  (*Id.* at 5-6).  Finally, Count IV is entitled "National Origin Discrimination National Origin Harassment" and contains discrimination and hostile work environment claims under Title VII.  (*Id.* at 7).

[7] Title VII and § 1981 "have the same requirements of proof and use the same analytical framework . . . ."  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  Therefore, the court does not differentiate between Jamous's claims brought under Title VII or § 1981 in this memorandum opinion.

judgment.  The court begins by considering Jamous's retaliation claims before discussing his discrimination and hostile work environment claims.

### A.  **Retaliation Claims**

Jamous claims Saint-Gobain retaliated against him after he complained about employment practices and discrimination prohibited by § 1981 and Title VII.  (Doc. 1 at ¶¶ 25, 28-32 & 36-37).  Saint-Gobain moves for summary judgment on Jamous's retaliation claims, arguing Jamous has not shown he engaged in protected activity.  (Doc. 43 at 21-22).  Jamous offered no argument in opposition to Saint-Gobain's motion for summary judgment on his retaliation claims.[8]  (*See* Doc. 45).  Accordingly, the claims are deemed abandon, and for this reason alone, Saint-Gobain's motion for summary judgment is due to be granted as to Jamous's retaliation claims.  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), cert denied, 516 U.S. 817 (1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").  In addition, the court has carefully reviewed the Rule 56 record and concludes Saint-Gobain is entitled to summary judgment on Jamous's retaliation claims because he cannot establish a claim of retaliation.

"Both Title VII and § 1981 prohibit employers from retaliating against a person because []he has opposed any practice prohibited by Title VII or made a charge of discrimination."  *Wells v. Gen. Dynamics Info. Tech. Inc.*, 571 F. App'x 732, 736 (11th Cir. 2014) (citing 42 U.S.C. § 2000e-3(a)).  To establish his retaliation claims under § 1981 and Title VII, Jamous must show: (1) he engaged in a statutorily protected activity, (2) he suffered a materially adverse action, and (3) there was some causal relation between the two events.  *Id.* (citing *Butler v. Ala. Dep't of*

---

[8] In his opposition brief, Jamous concedes he "is primarily focused on his claims relating to discriminatory action under Title VII and 42 U.S.C. § 1981, and his hostile environment claims under Title VII and 42 U.S.C. § 1981."  (Doc. 45 at 6).

*Transp.*, 536 F.3d 1209, 1212-13 (11th Cir. 2008)); *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citation omitted).  There is no evidence in the Rule 56 record to show Jamous participated in any statutorily protected activity Saint-Gobain was aware of prior to his termination; rather, the record shows Jamous did not complain to anyone at Saint-Gobain about the alleged discrimination and harassment he encountered at work.  Indeed, Jamous's interrogatory responses and deposition testimony show he did not make any internal complaints to Saint-Gobain or complain to any current or former Saint-Gobain employees about any employment-related matter.[9]  (Doc. 41-2 at 24; Doc. 44-4 at 4).  Additionally, Jamous did not file his EEOC charge until August 1, 2013—one day after Saint-Gobain terminated his employment with the company.  (*See* Doc. 44-1 at 2; Doc. 44-5 at 2).  Thus, there is no causal link between the filing of Jamous's EEOC charge and any alleged retaliatory actions by Saint-Gobain.[10]  *See Raney v. Vinson Guard Serv.*, 120 F.3d 1192, 1197 (11th Cir. 1997) ("In order to satisfy the 'causal link' prong of a prima facie retaliation case, a plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action.") (citation omitted).

---

[9] While testifying about a written disciplinary notice Jamous received in February 2013, he stated he "complained about supervisors before, and they didn't do [anything] about it." (Doc. 41-2 at 14).  Jamous did not provide any additional information regarding the timing or substance of his complaint; thus, even when viewed in the light most favorable to Jamous, his deposition testimony is not sufficient to create a genuine issue of material fact regarding if he participated in protected activity prior to the alleged retaliatory acts.

[10] Although Jamous contacted OSHA to complain about air quality in a building, he did not tell anyone at Saint-Gobain about contacting OSHA or his complaint, and Saint-Gobain did not receive notice of an OSHA complaint filed by Jamous.  (Doc. 41-1 at 3; Doc. 41-2 at 57-58 & 68-69; Doc. 44-6 at 5).  Moreover, the filing of an OSHA complaint is not a statutorily protected activity under Title VII and § 1981.  *See* 42 U.S.C. § 2000e-2 & 3.  Accordingly, Jamous cannot base his retaliation claims on the filing of his OSHA complaint.

Jamous did not establish a claim of retaliation because there is no evidence he participated in any statutorily protected activity prior to his termination.  As a result, Jamous's retaliation claims fail as a matter of law, and Saint-Gobain is entitled to summary judgment as to those claims.

## B.  Discrimination Claims

Jamous asserts discrimination claims against Saint-Gobain based on alleged discriminatory discipline, discriminatory failure to promote, and discriminatory termination of his employment.[11]  (Doc. 1 at ¶¶ 23-24, 36 & 43-44).  Jamous moves for summary judgment on his discriminatory termination claim, while Saint-Gobain seeks summary judgment on each of the discrimination claims Jamous asserts against it.  (*See* Docs. 41 & 43).  Because the parties' motions for summary judgment on Jamous's discriminatory termination claim are essentially mirror images of each other, the court will address the motions together after dispensing with Jamous's discriminatory failure to promote and discriminatory discipline claims.

### 1.   Legal Standard for Jamous's Discrimination Claims

Jamous bears the ultimate burden of proving his discrimination claims.  *See, e.g.*, *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006) ("[T]he ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff.") (citation omitted); *Walker v. Nations Bank of Florida N.A.*, 53 F.3d 1548, 1555 (11th Cir. 1995).  When there is no direct evidence of

---

[11] Saint-Gobain argues Jamous did not assert a viable discriminatory termination claim in his Complaint.  (*See* Doc. 48 at 5-6).  Because this argument was brought up in Saint-Gobain's reply brief, and because the court concludes the Rule 56 record establishes any discriminatory termination claim asserted by Jamous against Saint-Gobain fails as a matter of law, the court does not address if the discriminatory termination claim was adequately alleged in Jamous's Complaint.

discrimination, as here,[12] a plaintiff may rely on circumstantial evidence to establish his claim, employing the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089 (1981).  This requires a plaintiff to first establish a prima facie case by presenting evidence (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly-situated individual outside his protected class.  *Maynard v. Bd. of Regents of Div. of Fla. Dept. of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1817).  "The successful assertion of a prima facie case then creates a rebuttable presumption that the employer unlawfully discriminated against the plaintiff."  *Rioux v. City of Atlanta, Ga.*, 520 F.3d, 1269, 1275 (11th Cir. 2008) (internal quotation marks and citations omitted).

Once the plaintiff establishes a prima facie case, the burden then shifts to the employer to produce evidence it had a legitimate, non-discriminatory reason for the challenged action.  *Id.* Because the employer must only produce, not prove, a non-discriminatory reason for its action, the employer's burden is "exceedingly light."  *Walker*, 53 F.3d at 1556.  If the employer satisfies its burden, the presumption the employer unlawfully discriminated against the plaintiff drops out of the case, and the burden shifts back to the plaintiff to prove the employer's "proffered reason really is a pretext for unlawful discrimination."  *Rioux*, 520 F.3d at 1275 (internal quotation

---

[12] "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption."  *Standard*, 161 F.3d at 1330; *see also Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227 (11th Cir. 2002) ("'[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the [protected classification]' are direct evidence of discrimination.") (citation omitted).  Jamous does not argue he has direct evidence of discrimination in either his motion for summary judgment or his opposition to Saint-Gobain's motion.  (*See* Docs. 41 & 45).

marks and citations omitted).  To prove pretext, the plaintiff must "demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'"  *Id.* (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

2. <u>Discriminatory failure to promote and discriminatory discipline claims</u>

Saint-Gobain moved for summary judgment on Jamous's claims of discriminatory failure to promote and discriminatory discipline.  (Doc. 43 at 22, 26-28).  Jamous does not seek summary judgment on these claims, or even respond to Saint-Gobain's arguments for summary judgment on the claims.  (*See* Docs. 41 & 45).  Accordingly, as with his retaliation claims, Jamous abandoned his discriminatory failure to promote and discriminatory discipline claims by failing to respond to Saint-Gobain's motion for summary judgment on the claims.  *See Resolution Trust Corp.*, 43 F.3d at 599.  As a result, Saint-Gobain is entitled to summary judgment on Jamous's discriminatory failure to promote and discriminatory discipline claims. Additionally, the Rule 56 record reveals the claims fail as a matter of law.

First, the record shows the only promotion Jamous applied for at Saint-Gobain and did not receive was a promotion to a lab position.  (*See* Doc. 41-2 at 8-10).  Jamous applied for the promotion to the lab position in the 1990s.  (*Id.*).  Thus, any claim based on the denial of a promotion to the lab position is untimely because it was not filed within 180 days.  *See* 42 U.S.C. § 2000e-5(e)(1).  Because Jamous was not denied any promotions within 180 days of the filing of his EEOC charge on August 2, 2013, his discriminatory failure to promote claim fail as a matter law, and Saint-Gobain is entitled to summary judgment as to Jamous's discriminatory failure to promote claim.

Next, the record shows the only discipline Jamous received in the 180 days before the filing of his EEOC charge was a written notice of warning dated February 5, 2013. (*See* Doc. 44-6 at 6 & 63). Jamous received the written notice of warning for not following a mix card and improperly running feed into a furnace. (*See* Doc. 41-2 at 12; Doc. 44-6 at 63). Although Jamous disputes signing the written notice of warning and asserts he should not have received the warning, he did not produce any evidence that receiving the written warning had any impact on his pay or benefits. (*See* Doc. 41-2 at 10-13). Indeed, the written warning did not result in Jamous being suspended, losing any pay or benefits, or being subjected to any further discipline.[13] (*See* Doc. 44-6 at 6). Thus, the written warning was not an adverse employment action, and Jamous did not establish his prima facie claim of discriminatory discipline. *See Rainey v. Holder*, 412 F. App'x 235, 238 (11th Cir. 2011) (noting "when a lower performance evaluation does not result in a 'loss of pay or benefits or further discipline,' it does not constitute an adverse employment action") (quoting *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1240 (11th Cir. 2001)); *Davis*, 245 F.3d at 1239 ("[T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment.") (emphasis in original). As a result, Saint-Gobain is entitled to summary judgment as to Jamous's discriminatory discipline claim.

### 3.   Discriminatory termination claim

Both Jamous and Saint-Gobain seek summary judgment on Jamous's discriminatory termination claim. (*See* Doc. 41 at 6-13; Doc. 43 at 29-31). Jamous argues the evidence in the

---

[13] Even after receiving the written warning, Jamous received the same 1.98 percent merit pay raise in April 2013 that all the hourly employees at Saint-Gobain's Huntsville facility received. (Doc. 44-6 at 6).

Rule 56 record establishes there is no question of material fact regarding his prima facie claim and that Saint-Gobain's proffered reason for his termination is pretext for its actual discriminatory purpose. (Doc. 41 at 6-13). For its part, Saint-Gobain argues Jamous cannot establish his prima facie claim and did not rebut its legitimate, nondiscriminatory reason for Jamous's termination. (Doc. 43 at 29-31).

a. *Prima Facie Case*

Saint-Gobain does not dispute that Jamous is a member of a protected class, was subjected to an adverse employment action, and was qualified to do his job. (*See* Doc. 43 at 29-31; Doc. 46 at 13-19). Thus, the only element of Jamous's prima facie case at issue is if Saint-Gobain treated Jamous less favorably than similarly-situated employees outside of his protected class. *See Maynard*, 342 F.3d at 1289 (listing elements of prima facie case of discrimination).

Jamous does not point to specific evidence in the Rule 56 record to indicate he was treated less favorably than similarly situated employees outside of his protected class. Rather, he simply "maintains that no other person has been dismissed on the basis of having an introverted personality or for believing in conspiracy theories" and argues "[n]o other employee[s] w[ere] interrogated about their beliefs regarding their personal lives."[14] (Doc. 41 at 11). Jamous's argument misses the mark, however, because the record does not indicate that Saint-Gobain terminated Jamous's employment because he has an introverted personality and believes in conspiracy theories, or because of any of his beliefs regarding his personal life. Instead, the Rule 56 record shows Saint-Gobain terminated Jamous based on his alleged failure to contact the

---

[14] Jamous also asserts that "other similarly-situated employees' religious and cultural beliefs have not been interrogated," but the examples he relies upon to support that assertion relate to actions by the State of Alabama or its citizens at large and not to any action by Saint-Gobain. (*See* Doc. 41 at 11-12 & Doc. 45 at 10). Accordingly, they do not support his claims that Saint-Gobain discriminated against him based on his religion, race, and national origin.

employer by the date specified in a letter Saint-Gobain sent to Jamous when it could not reach him after his medical leave period ended.  (Doc. 41-1 at 22-23).  Jamous had been on medical leave for one month at the recommendation of Dr. Aeschilmann at Alabama Psychiatric Services, P.C. following an incident in which Jamous erratically operated a skid steer while moving hot material at work, which caused the hot material to fall on top of the skid steer and on the floor.  (Doc. 41-1 at 21; Doc. 44-7 at 2).  At the time of the incident, Jamous told his supervisor something was wrong with the skid steer and the FBI must have "done some theology" to it, although his supervisor was able to operate the skid steer without any issues. (Doc. 41-2 at 34; Doc. 44-7 at 2; Doc. 44-9 at 2).

Jamous does not address if he was treated differently than employees who failed to contact Saint-Gobain by a certain date when required to do so.  He also does not address if he was treated differently than employees who blamed outside forces after erratically operating equipment at the plant.  In addition, Jamous does not address if he was treated differently than employees who erratically and unsafely operated equipment at the plant.  Indeed, the only comparators Jamous specifically identifies in his written discovery responses are four individuals; one of the individuals allegedly received more favorable treatment by being paid more for overtime during a food incident in 2003, and the others received more favorable treatment related to a job transfer in 2004.  (Doc. 41-2 at 24; Doc. 44-4 at 5).  There is nothing to suggest those four individuals engaged in conduct similar to the conduct leading up to Jamous's medical leave and termination.  Accordingly, they are not valid comparators for Jamous's discriminatory termination claim. *See Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) ("We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with

17

oranges."); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) ("In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways).

Jamous also argues that Kevin White, a supervisor at Saint-Gobain, "was not sent for psychiatric treatment even though his aggressive behavior is common knowledge within Saint-Gobain." (Doc. 41 at 12). However, the aggressive behavior Jamous alleges White engaged in was just yelling and screaming, and not erratically operating equipment at the plant. (Doc. 41-2 at 58-59). Accordingly, White is not a valid comparator because the acts Jamous and White engaged in are not similar or of comparable seriousness. *See Holifield*, 115 F.3d at 1562.

Jamous did not satisfy his burden of showing Saint-Gobain treated him less favorably than similarly-situated employees outside his protected class, and, therefore, did not establish his prima facie claim of discriminatory termination. As a result, Jamous is not entitled to summary judgment on his discriminatory termination claim, while Saint-Gobain is entitled to summary judgment on the claim.

b. *Pretext*

Even if Jamous established his prima facie claim of discriminatory termination, Saint-Gobain argues it would still be entitled to summary judgment because Jamous failed to rebut its legitimate nondiscriminatory reason for terminating his employment. (Doc. 43 at 30-31; Doc. 46 at 16-19; Doc. 48 at 8). On the other hand, Jamous argues Saint-Gobain's proffered reason for his termination was pretext for its discriminatory purpose. (Doc. 41 at 12-13; Doc. 45 at 7-13). To prove pretext, Jamous "must meet [Saint-Gobain's proffered reason] 'head on and rebut it'" by showing "both that the reason was false and that discrimination was the real reason" for its

decision to terminate his employment.  *Holmes v. Alabama Bd. of Pardons & Paroles*, 591 F.

App'x 737, 743 (11th Cir. 2014) (citing *Chapman v. A1 Transport*, 229 F.3d 1012, 1030 (11th

Cir. 2000) & *Brooks*, 446 F.3d at 1163).

After a careful review of the Rule 56 record, the court concludes Jamous did not

demonstrate Saint-Gobain's proffered reason for terminating his employment was pretext for

discrimination.  As noted above, Saint-Gobain asserts it terminated Jamous's employment due to

his failure to contact Saint-Gobain by the date specified in a letter it sent to Jamous.[15]   (*See* Doc.

41-1 at 23; Doc. 43 at 30; Doc. 44-1 at 2; Doc. 44-6 at 4; Doc. 46 at 16: Doc. 48 at 8).

Specifically, the reason stated for Jamous's termination was "job abandonment/no-call – no-

show based on his failure to respond to the letter of July 19, 2013."[16]  (Doc. 44-1 at 2; Doc. 44-6

at 4).  The July 19, 2013 letter to Jamous was sent by Nancy Hale, the Human Resources

Manager for Saint-Gobain's Huntsville plant, and stated in pertinent part as follows:

> We have been attempting to contact you for the last couple of days concerning
> your absence.  According to the letter from the Alabama Psychiatric Services,
> P.C. you were evaluated and to be off work from 06/14/13 through 4/14/2013.
> [ . . . ]  If we do not hear from you by July 31, 2013, we will assume you have left
> on your own accord without notice to us and terminated your employment at that
> time.  If you have any questions, please contact me by telephone only.

---

[15] In his opposition to Saint-Gobain's motion for summary judgment, Jamous appears to
argue he was terminated due to his failure to obtain a release to return to work from Alabama
Psychiatric Services.  (Doc. 45 at 11).  Because this argument is at odds with Saint-Gobain's
proffered reason for terminating Jamous's employment, the court need not address it to rule on
the pending motions for summary judgment.  *See Holmes*, 591 F. App'x at 743 ("To show
pretext, the plaintiff cannot recast the employer's proffered reason, but must meet the reason
'head on and rebut it.'") (citation omitted).

[16] Because Jamous was terminated based on job abandonment and not for a disciplinary
or performance issue, Saint-Gobain's progressive discipline process did not apply, and there was
no requirement to provide Jamous with an oral and written warning before terminating his
employment.  (Doc. 44-6 at 4).

(Doc. 41-1 at 22).  Ms. Hale asserts she did not receive a call or voicemail from either Jamous or

his attorney in response to the letter.  (Doc. 44-6 at 3).  Additionally, an August 1, 2013 letter to

Jamous regarding his termination specifically states in pertinent part:

> A registered letter was sent to you July 19th 2013 [] concerning your employment
> with Saint-Gobain, which you received on July 22nd, 2013.  You were required to
> contact us by July 31st, 2013.  As of July 31st, 2013, we still had not heard from
> you; therefore, your employment with Saint-Gobain is terminated effective on
> that date.  You are considered to have left on your own accord without notice.…

(Doc. 41-1 at 23).

Jamous's primary argument to rebut Saint-Gobain's proffered reason for his termination

is that the reason is false because his attorney called Saint-Gobain on his behalf in response to

the July 19, 2013 letter from Ms. Hale.  (*See* Doc. 41 at 12-13; Doc. 45 at 7-8).  Although

Jamous testified that his attorney called Saint-Gobain on his behalf and left a message, there is

no admissible evidence regarding the content of the message or who his attorney called.[17]  (Doc.

41-2 at 5).  Thus, Jamous's testimony that he saw his attorney make a call and heard her leave a

message on his behalf is not enough to create an issue of fact regarding if Saint-Gobain's

proffered reason for his termination was false.

Additionally, even if Jamous established Saint-Gobain's proffered reason for his

termination was false, he has not introduced any evidence to suggest discrimination was the real

reason for his termination.  Jamous argues Saint-Gobain required him to get a medical and

psychiatric evaluation and take medical leave based on discriminatory purposes and fear of his

race, religion, and national origin, but he mischaracterizes evidence in the record to support his

argument.  (*See* Doc. 45 at 7-13).  Specifically, Jamous argues he was not a threat to himself or

others and "nothing about [his] activities [was] dangerous;" however, the undisputed evidence

shows he operated a skid steer in a way that caused hot material to fall on top of the skid steer

---

[17] Jamous's attorney has agreed she will not offer evidence in this case.  (Doc. 49 at 1).

and on the floor around the skid steer.  (Doc. 45 at 8 & 10; *See also* Doc. 41-2 at 33-34; Doc. 44-7 at 2; Doc. 44-8 at 2).  Jamous also asserts he was "half joking" when he made the comments regarding the FBI's interference with the skid steer, but there is no evidence he told Saint-Gobain he was joking before he was placed on medical leave, and he admitted his supervisor might have thought he was serious.  (*See* Doc. 41-2 at 41; Doc. 45 at 8-9).  Next, Jamous asserts he simply had difficulty handling the skid steer during the May 2, 2013 incident, but he does not acknowledge or address the evidence that his supervisor was able to operate the skid steer without any issues, and there is nothing to suggest Jamous was not trained to operate the skid steer.  (*See* Doc. 44-7 at 2; Doc. 45 at 8-10).  Finally, Jamous argues "his mishandling of equipment was no more egregious than any other violation that regularly took place in the 'safety-sensitive' environment of Saint-Gobain," but he does not cite to any evidence indicating violations regularly occurred at Saint-Gobain.  (*See* Doc. 45 at 8).

Jamous has not shown there is a genuine issue of material fact regarding if Saint-Gobain's legitimate proffered reason for his termination is pretext for discrimination because he has not introduced admissible evidence that the reason was false or evidence suggesting discrimination was the real reason for Saint-Gobain's decision to terminate his employment.  As a result, Jamous is not entitled to summary judgment on his discriminatory termination claim, and Saint-Gobain is entitled to summary judgment on the claim.

### C.  Hostile Work Environment Claims

Jamous asserts Saint-Gobain violated § 1981 and Title VII by subjecting him to a hostile work environment on the basis of his race, national origin, and religion.  (Doc. 1 at ¶¶ 25, 35-38 & 45).  Both parties seek summary judgment on Jamous's hostile work environment claims, and the court will address the motions together.  (Doc. 41 at 13-17; Doc. 43 at 22-26).

To establish his hostile work environment claims against Saint-Gobain, Jamous must show his "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [were] sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367 (1993)). To do so, Jamous must present evidence: (1) he is a member of a protected class; (2) he was subjected to unwelcome racial harassment; (3) the harassment was based on his protected characteristics; (4) the harassment was severe or pervasive enough to alter the terms and conditions of his employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for the environment under a theory of either direct or vicarious liability. *Adams v. Austal, U.S.A., L.L.C.,* 754 F.3d 1240, 1248-49 (11th Cir. 2014); *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010).

There is no dispute Jamous is a member of a protected class, but Saint-Gobain argues Jamous cannot establish the remaining four elements of his hostile work environment claims. (Doc. 43 at 23). As discussed below, the court finds Jamous has not shown most of the harassment he experienced was based on a protected characteristic or that the harassment was severe or pervasive enough to alter the terms and conditions of his employment. Accordingly, the court limits its discussion of Jamous's hostile work environment claims to those two elements.

   1. <u>Harassment based on protected characteristic</u>

It is a "bedrock principle [in the Eleventh Circuit] that not all objectionable conduct or language amounts to discrimination under Title VII" and § 1981. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012) (citation and internal quotation marks omitted); *Guthrie v.*

*Waffle House, Inc.*, 460 F. App'x 803, 806 (11th Cir. 2012).  "Therefore, only conduct that is

'based on' a protected category, such as race, may be considered in a hostile work environment

analysis."  *Jones*, 683 F.3d at 1297 (citation omitted).  Thus, behavior and comments that do not

relate to race, religion, or national origin will not be counted in the court's hostile work

environment analysis.  *Id.* (citations omitted).

  Here, Jamous bases his hostile work environment claims on the following conduct by his

supervisors or other employees at Saint-Gobain:

> (1) requiring Jamous to do work for which he was not trained and placing him in
>     unsafe working conditions, "then chastising and disciplining him for failure to
>     meet expectations;"
> (2) requiring him to operate broken machinery that was unsafe;
> (3) requiring Jamous "to enter buildings where the air was filled with dust
>     particles to the point where breathing was difficult;"
> (4) disciplining Jamous for an accident in which he hit another employee with a
>     forklift, while other employees were not disciplined for similar incidents;
> (5) disciplining him for faulty equipment;
> (6) disciplining him for not accurately calculating a mix card;
> (7) denying Jamous an "opportunity to accrue overtime in the same manner as
>     other employees;"
> (8) threatening to share Jamous's personal information, including his social
>     security number, "to make it easier to have his identity stolen;"
> (9) forbidding Jamous from reading the Quran during his breaks at work, while
>     other employees were allowed to read from the Bible.

(Doc. 41 at 15-16; Doc. 45 at 14).

  The only conduct based on Jamous's race, religion, or national origin is forbidding

Jamous from reading the Quran at work.  Indeed, Jamous does not explain how the first eight

actions he complains of are based on a protected characteristic, but instead simply asserts that

"[p]ut in context of the general pattern of harassment faced by [] Jamous, it is clear that there

was racial animus underlying his treatment at [Saint-Gobain's] plant."  (*See* Doc. 41 at 15-16;

Doc. 45 at 14).  His only specific response to Saint-Gobain's argument that these actions were

not based on a protected characteristic is that the reason for the actions "was brought to light

through Donnie Lamb's insistence that [] Jamous immediately stop reading the Quran in the break room where other were allowed to read bibles at will." (Doc. 45 at 14). Jamous testified Lamb made him stop reading the Quran one time while at work, but there is no evidence linking this incident to any other action by Saint-Gobain, or even suggesting the incident is related to other actions taken by Saint-Gobain. (*See* Doc. 41-2 at 60). Accordingly, the incident involving Lamb is not sufficient to show the other conduct Jamous complains of was based on his race, religion, or national origin, and that conduct will not be considered in the court's analysis of Jamous's hostile work environment claims.

2.   Severe or pervasive harassment

Federal employment laws are not a "general civility code," and only harassment severe or pervasive enough to alter the terms of employment will create an actionable hostile work environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 789, 118 S. Ct. 2275 (1998) (citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998 (1993)). "[T]he Supreme Court and [Eleventh Circuit] have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment:  (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (citing *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997), citing in turn *Harris v. Forklift Systems, Inc.*, 510 U.S. at 23).

Here, the record shows the harassment Jamous experienced did not rise to the level to be severe or pervasive enough to objectively alter the terms and conditions of Jamous's employment.  Jamous testified Donnie Lamb, a supervisor at Saint-Gobain, told him to stop

reading the Quran on one occasion even though other employees were allowed to read the Bible and magazines, including Playboy, in the breakroom. (Doc. 41-2 at 60). When asked about when he was told to stop reading the Quran at work, Jamous confirmed that it occurred only once during his employment at Saint-Gobain. (*Id.* at 60 & 65). Additionally, Jamous did not offer testimony or evidence regarding any other conduct by Saint-Gobain that was based on his religion, race, or national origin. A single incident in which Jamous was told to stop reading the Quran during his approximately eighteen years of employment with Saint-Gobain is not frequent, nor is it physically threatening or humiliating, and there is no evidence the incident interfered with Jamous's job performance. Thus, even if the incident is considered severe, it does not rise to the level of being severe or pervasive enough to objectively alter the terms and conditions of Jamous's employment. *See Faragher*, 524 U.S. at 788 (noting that "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'"); *Jones v. United Space Alliance, L.L.C.*, 170 F. App'x 52, 56 (11th Cir. 2006) (affirming summary judgment when the Rule 56 record showed the alleged incidents of religious harassment did not occur on a repeated basis, were not physically threatening or humiliating, and did not interfere with the plaintiff's job performance).

Because the alleged religious harassment Jamous encountered was not severe or pervasive enough to objectively alter the terms and conditions of Jamous's employment, his hostile work environment claim fails as a matter of law. As a result, Jamous's motion for summary judgment is due to be denied as to his hostile work environment claims, and Saint-Gobain's motion for summary judgment on the claims is due to be granted.

**IV.  CONCLUSION**

Based on the foregoing, Jamous's motion for summary judgment (doc. 41) is due to be denied.  Saint-Gobain's motion for summary judgment (doc. 42) is due to be granted, and Jamous's claims against Saint-Gobain are due to be dismissed with prejudice.  A separate order will be entered.

**DATED** this 10th day of August, 2016.

_John E. Ott_

**JOHN E. OTT**
Chief United States Magistrate Judge

26